**UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| SHIMON MAIMON,<br>Plaintiff,<br>v.<br>THE UNITED STATES OF AMERICA,<br>Defendant. | No. 24-cv-1832 C<br>Judge Matthew H. Solomson |

**PLAITNIFF'S RESPONSE TO DEFENDANT'S PARTIAL MOTION TO DISMISS PURSUANT TO RCFC 12(b)(1) AND RCFC 12(b)(6)**

MEREDITH MARTIN ADDY
Attorney of Record

ADDYHART LLC
10 Glenlake Parkway, Suite 130
Atlanta, Georgia 30328
312.320.4200
meredith@addyhart.com

Of counsel:
CHARLES A. PANNELL III

ADDYHART LLC
10 Glenlake Parkway, Suite 130
Atlanta, Georgia 30328
770.715.2020
cpannell@addyhart.com

August 15, 2025

*Attorneys for Plaintiff*
*Shimon Maimon*

# TABLE OF CONTENTS


I. INTRODUCTION .......... 1

II. BACKGROUND .......... 2

A. Pre-VISTA Research and Development of Dr. Maimon's nBn Invention .......... 2

B. The VISTA Program .......... 3

C. The VISTA Infringing Conduct .......... 6

1. The Activities that Caused Infringement by Third Parties .......... 6

2. How the VISTA Designs Specifically Infringed Dr. Maimon's Patents .......... 8

III. LEGAL STANDARD .......... 8

IV. ARGUMENT .......... 11

A. Dr. Maimon Did Not Assert SNL's Work As A Claim Against the Government .......... 11

B. JPL's VISTA Activities Infringed Dr. Maimon's '871 and '657 Patents After November 7, 2018 .......... 12

1. The Government's Motion Criticizes JPL's pre-VISTA Activity, Not its VISTA Activity .......... 12

2. Dr. Maimon's Actual Allegations Regarding the VISTA Program and JPL's Involvement Allege Plausible Infringement Facts After November 7, 2018 .......... 14

3. The Government Improperly Interprets and Attacks the Evidence on a Motion to Dismiss. .......... 16

4. Dr. Maimon's allegations establish infringement or the '657 patent that issued October 4, 2022 .......... 18

C. The Pleadings Sufficiently Establish the Work of Third-Party Companies Under VISTA Were For the Government .......... 19

1. The VISTA Activities of Third-Party Companies Infringed Dr. Maimon's Patent After November 7, 2018 .......... 19

2. The Amended Complaint Adequately Pleads Authorization and Consent and Benefit to the Government After November 7, 2018 .......... 21

D. If Necessary, Dr. Maimon Should Be Granted Leave to Amend and Add Dates Based on the Evidence Attached to the Amended Complaint .......... 33

V. CONCLUSION .......... 34

# TABLE OF AUTHORITIES

**Cases**

*Advanced Software Design Corp. v. FRB of St. Louis*,
583 F.3d 1371 (Fed. Cir. 2009) ........ 25, 26, 30

*Arista Records, LLC v. Doe 3*,
604 F.3d 110 (2d Cir. 2010) ........ 9

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ 9

*Astaris, LLC v. Fire-Trol Holdings, LLC*,
No. 03-cv-1468-PHX-ROS, 2006 U.S. Dist. LEXIS 384
(D. Ariz. Jan. 5, 2006) ........ 26

*BAE Sys. Info. & Elec. Sys. Integration, Inc. v. Aeroflex, Inc.*, No. 09-769-LPS, 2011 U.S. Dist. LEXIS 90959 (D. Del. Aug. 2, 2011) ........ passim

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........ 9, 10

*Cedars-Sinai Med. Ctr. v. Watkins,*
11 F.3d 1573 (Fed. Cir. 1993) ........ 9

*Cormack v. United States*,
117 Fed. Cl. 392 (2014) ........ 10

*Disc Disease Sols. Inc. v. VGH. Sols., Inc.*,
888 F.3d 1256 (Fed. Cir. 2018) ........ 9

*Exergen Corp. v. Wal-Mart Stores, Inc.*,
575 F.3d 1312 (Fed. Cir. 2009) ........ 9

*Hughes Aircraft Co. v. United States*,
534 F.2d 889 (1976) ........ 26, 30

*IRIS Corp. v. Japan Airlines Corp.*,
769 F.3d 1359 (Fed. Cir. 2014) ........ 25

*JG Techs., LLC v. United States*,
156 Fed. Cl. 691 (2021) ........ 10, 22

*K-Tech Telecomms, Inc. v. Time Warner Cable, Inc.*,
714 F.3d 1277 (Fed. Cir. 2013) ........ 9, 10, 23

*Nalco Co. v. Chem-Mod, LLC*,
883 F.3d 1337 (Fed. Cir. 2018) .......... 10

*Pieczenik v. United States*,
No. 2023-1376, 2023 LEXIS 20418
(Fed. Cir. Aug. 8, 2023) .......... 29

*Raymond Eng'g Inc. v. Miltope Corp.*,
No. 85 CIV. 2685 (RWS), 1986 U.S. Dist. LEXIS 25135
(S.D.N.Y. May 23, 1986) .......... 27

*Saint-Gobain Ceramics & Plastics, Inc. v. II-VI Inc.*,
369 F. Supp. 3d 963 (C.D. Cal. 2019) .......... 24, 27, 29

*Sevenson Envtl. Servs. v. Shaw Envtl., Inc.*,
477 F.3d 1361 (Fed. Cir. 2007) .......... 25, 30

*Starobin v. United States*,
662 F.2d 747 (Ct. Cl. 1981) .......... 10

*Trojan, Inc. v. Shat-R-Shield, Inc.*,
885 F.2d 854( Fed. Cir. 1989) .......... 26

*Trusted Integration, Inc. v. United States*,
659 F.3d 1159 (Fed. Cir. 2011) .......... 9, 22

*TVI Energy Corp. v. Blane*,
806 F.2d 1057 (Fed. Cir. 1986) .......... 26, 27, 28, 30

*Vanquish Worldwide, LLC v. United States*,
147 Fed. Cl. 390 (2020) .......... 9

**Rules**

Court of Federal Claims Rule 12(b)(1) .......... 8

Court of Federal Claims Rule 12(b)(6) .......... 9

**Legislative Materials**

*The Impacts of Sequestration and/or a Full-Year Continuing Resolution on the Department of Defense: Hearing Before the Comm. on Armed Services*,
113th Cong. 173, S. Hrg. 113-173 (2013) .......... 28, 32

## I. INTRODUCTION

The Government's motion seeks to dismiss the research and development efforts of JPL and third parties during the VISTA program based on purportedly insufficient allegations of activities and authorization occurring after November 7, 2018. However, the Government's motion primarily attacks pleadings in the Amended Complaint describing pre-VISTA activity and insufficiently addresses those that do relate to Dr. Maimon's infringement claims against VISTA.

The Government attacks supposed allegations against SNL, but Dr. Maimon has made no claim against the activities of SNL at this time so there is nothing to dismiss. The Government further attacks allegations that JPL copied and researched Dr. Maimon's inventions from 2007 to 2011 leading up to the VISTA program, but these allegations in the Amended Complaint are simply background facts that were not part of Dr. Maimon's VISTA section of the Amended Complaint that describes of the activities of VISTA, which ran from 2011 through 2022. Indeed, the facts actually alleged about VISTA make clear that the program lasted for ten years, and included infringing activities well past 2018 and through 2022. Dr. Maimon alleged the types of detectors being tested by VISTA during the relevant 2018 to 2022 time period, how IQE, IntelliEpi, and JPL's testing of VISTA wafers infringed, and how fabrication of FPAs from those wafers by JPL, Raytheon, L3Harris, and Teledyne-FLIR also infringed. This more than meets this Court's instruction (Dkt 12), requiring Dr. Maimon to explain the connection to VISTA, the products that infringed under VISTA, and the basis for how they infringe.

The Government produces incomplete contracts to suggest that third-party companies IQE, IntelliEpi, Raytheon, L3Harris, and Teledyne-FLIR had no Government authorization to infringe after November 7, 2018. But, the Government's evidence only strengthens the reasonableness of Dr. Maimon's allegations that there is Government authorization. The produced VISTA contracts

between the Government and the third parties contain express authorization and consent clauses under 48 C.F.R. § 52.227-1 (Alt. 1). The Government argues the contracts expired by 2016, but it leaves unchallenged Dr. Maimon's allegations and evidence in the Amended Complaint that such contracts were actually renewed by the Government in 2017 for a five-year term including 2018 through 2022. Thus, the Government's evidence does nothing to overcome the Amended Complaint's well-plead allegations and the inferences that can be taken therefrom. The Government may disagree with the pleadings, but it does nothing to contradict or discredit them in its facial attack.

For these reasons as detailed and set forth herein, the Government's Partial Motion to Dismiss should be denied.

## II. BACKGROUND

### A. Pre-VISTA Research and Development of Dr. Maimon's nBn Invention

Dr. Maimon developed his nBn invention through hundreds of trial-and-error attempts over the course of multiple years in the late 90s and early 2000s. Dkt. 15 ¶¶39-40. In 2007, he demonstrated that work to the Government, specifically Dr. MeiMei Tidrow, who had been seeking to develop the next generation of infrared detection. *Id.* ¶¶66-68. The Government recognized that Dr. Maimon's invention was revolutionary and would allow defense contractors to provide the U.S. Military with smaller, lighter, more efficient and reliable infrared cameras that used more robust and cheaper III-V semiconductor materials, which were important for military personnel and vehicles. *Id.* ¶¶69-71.

From 2007 to 2010, the Government sought to copy and reproduce Dr. Maimon's work. At the Government's request, Dr. Maimon met with scientists at the Jet Propulsion Laboratory (JPL), Sandia National Laboratories (SNL), and a private semiconductor manufacturer, IQE, to

share his recipes and demonstrate how to grow his nBn material. *Id.* ¶72. By at least 2008, JPL began manufacturing semiconductor wafers and photodetectors with Dr. Maimon's nBn design and from 2008 to 2011, continued to manufacture, study, and improve the design and its materials. *Id.* ¶¶72-73. By the end of its initial investigation, JPL's research indicated that the nBn architecture using a III-V material superlattice was the most promising to continue developing. *Id.* ¶¶74-75.

**B. The VISTA Program**

In 2010, the Government proposed a consortium of Government agencies, federally-funded labs, and private industry that would manufacture and study nBn wafers and FPAs to improve the nBn detector design and accelerate the industrialization of cheaper products for the military. *Id.* ¶¶76-77, 86-87. In April 2010, Government employees of the Army's Night Vision Electronic Sensors Directorate (NVESD) group held a meeting for potential VISTA participants and described how the VISTA program would focus on the development of III-V nBn superlattice detectors. *Id.* ¶78. In fact, at that meeting, the Government specifically thanked Dr. Maimon for his work in bringing about the nBn detector and its potential to usher in the next generation of infrared detectors. *Id.* ¶79. At the end of 2010, the Government was circulating a Task Plan to potential members that outlined the structure of VISTA, its goals to industrialize the nBn detector, and the contractual arrangement between members. *Id.* ¶80 (citing Task Plan at Dkt. 15-13).

The VISTA program ultimately began in 2011 and lasted through 2022. Dkt. 15 ¶¶82, 94, 283; Dkt. 15-15 at 3. Under VISTA, JPL managed the program through its task manager, Dr. Sarath Gunapala. Dkt. 15 ¶¶77, 81, 85. However, the U.S. Army's NVESD group (in particular Dr. Tidrow) ultimately directed, controlled, and approved the research, development, manufacture, and prototyping work of VISTA members. *Id.* ¶81. Throughout VISTA, the Government entered into contracts with industry participants, such as Raytheon, L3Harris,

Teledyne-FLIR, IQE, and IntelliEpi, that were in accordance with the prime contract NAS7-3001 between NASA and JPL. *Id.* ¶83. As noted by JPL, giving participants access to IP and patents was an important part of the contract with industry participants. The Government entered into such contracts so that members could obtain easier and cheaper access to intellectual property and patents. *Id.* (citing Dkt. 15-15 at 6). Although the Government maintains the confidence of its VISTA contracts and heavily redacts most information about them (Dkt. 15 ¶¶84, 307-308), Dr. Maimon was able to identify from public papers and presentations several VISTA contracts that participants entered into with the Government to perform research and development. *Id.* ¶¶84, 92, 95 n.35. Dr. Maimon has not alleged these are the only contracts between the Government and VISTA participants relating to the VISTA work.

In its motion to dismiss, the Government purports to have produced portions of some of the confidential VISTA contracts Dr. Maimon could identify from the public record,[1] including contracts between the Army's Contracting Command on behalf of NVESD and L3Harris (DA0292-335), Raytheon (DA0230-291), Teledyne (DA0394-466), and IntelliEpi[2] (DA0110-170). Dkt. 21 at 5-6. Notably, the VISTA contracts and solicitations contained the broadest express authorization and consent clause possible under FAR 52.227-1 (Alternate I) for patent

[1] While the Government claims the contracts attached to the Government's motion ended by 2016, they are notably incomplete. For example, the contracts reference attachments that are not included and heavily redacts other Government documents relating to the justification and approval of contract work. *See, e.g.,* DA0121, DA0237, DA0272, DA0321, DA0664-670. Furthermore, despite alleging and presenting evidence the VISTA contracts were renewed in 2017 (Dkt. 15 ¶94), the Government provides no such renewal contract and makes no claim the VISTA contracts it does provide are the only VISTA contracts. If the Government is going to present contractual evidence to which Dr. Maimon has no access, it should be required to provide all contractual evidence relating to VISTA.

[2] "IntelliEpi" is also referred to as "Intelligent Epitaxy Technology" or "IET" in some documents. *See* DA0110; Dkt. 15-15 at 37.

infringement caused by the work performed. DA0129, DA0152, DA0261, DA0279, DA0311, DA0482, DA0544.

In 2016, after five years of research and development, VISTA participants demonstrated prototypes to the U.S. Military. Dkt. 15 ¶93. However, the Government (specifically the Army's NVESD group led by Dr. Tidrow) realized the VISTA Consortium research and development was still needed and renewed the VISTA contracts in 2017 for another five-year term that lasted through 2022. *Id.* ¶94 (citing Hill Presentation Dkt. 15-15 at 37 recognizing that NVESD and Dr. Tidrow realized the need to renew VISTA and that "[t]he original Industrial Consortium contract was for five years and was renewed in 2017 with some changes in membership.").[3] The only changes identified in the renewal of the VISTA contracts was the inclusion of IQE, IntelliEpi, and Northrup Grumman as official members. *Id.*

Throughout the 10-year VISTA program from 2011 through 2022, the Government, JPL, and the other VISTA members regularly manufactured and used nBn detectors in order to develop and transition superlattice (specifically T2SLS) nBn detectors into industrial products. Dkt. 15 ¶¶75, 78-79,100-101, 113-121. During the second half of the VISTA program, from 2017 through 2022 in particular, the VISTA members focused on improving the manufacture of nBn III-V SLS HOT-BIRD wafers and FPAs prototyped for the Government in the first half of VISTA. *Id.*¶¶89-90, 96. As part of that work VISTA members would share information with the wafer growth foundries (IQE and IntelliEpi) that would optimize wafer growth to make each growth recipe repeatable with fewer defects. *Id.* ¶96. To provide this optimization feedback and product research and development, IQE and IntelliEpi, would provide wafers to the other VISTA members (*e.g.,*

[3] The transcript of the Hill Presentation submitted with the Amended Complaint refers to "NVSD" and "Dr. Tetreault" which are misspellings of NVESD and Dr. Tidrow, respectively. Dr. Maimon can submit the audio of that presentation if necessary.

JPL, Raytheon, L3Harris, and Teledyne-FLIR) that would then create FPAs for testing and evaluation. *Id.* ¶¶96, 105 (citing Dkt. 15-15 at 36, 38).

As highlighted by JPL's own VISTA science team, the later years of VISTA (especially 2018 through 2022) also applied these research, development, and fabrication efforts to dual-band wafer performance, alternative approaches for LWIR (long-wavelength infrared) detectors that revisited cBIRDS, the manufacturability of MWIR (mid-wavelength infrared) detectors, and material characterization studies. Dkt. 15 ¶¶95-96, 102; Dkt. 15-15 at 28, 36, 38. In fact, as of 2022 JPL claimed VISTA "continues to provide insight into the rapidly-developing antimonide-based infrared imaging sector" with "over 10 years of material and measurements." Dkt. 15-15 at 45. JPL scientists have identified Dr. Maimon's nBn architecture as being used throughout the VISTA program and have acknowledged nBn was a major contribution to the field and a crucial architecture for the type of superlattice detectors VISTA produced. Dkt. 15 ¶¶90, 97-98, 100-101, 113; Dkt. 15-10 at 7; 15-11 at 10, 17; Dkt. 15-15 at 30, 36.

### C. The VISTA Infringing Conduct

Although the Government maintains much of the VISTA contracts and research in confidence to this day (Dkt. 19), Dr. Maimon set forth in his Amended Complaint specific details and attached evidence illustrating the work performed by third parties under VISTA that drove infringement as well as the particulars demonstrating how such work infringed.

#### 1. The Activities that Caused Infringement by Third Parties

To start, the Amended Complaint charts the products and activities that infringed along with the agencies and companies involved in that infringement. Dkt. 15 pp. iv.–vi. Although many accused products procured by the Government resulted from research conducted by various companies during VISTA as Dr. Maimon alleges (*Id.* ¶¶109-121, 188, 207-210, 221-226, 230-234, 240, 251), the Government's Motion does not seek to dismiss the allegations with regard to those

products or their development. Instead, the Government's Motion focuses on the infringing activities by JPL and third-party companies doing research and development for the VISTA program. In that regard, Dr. Maimon accused two different types of VISTA products: (1) "nBn Semiconductor Wafers Manufactured and Tested for VISTA" by IQE, IntelliEpi and JPL, and (2) "nBn Semiconductor Wafers Fabricated into FPAs and Tested" that was performed by Raytheon, L3Harris, Teledyne-FLIR, and JPL. Dkt. 15 p.v. & ¶¶313-314, 329-330.[4]

With regard to the semiconductor wafer infringement under VISTA, the Amended Complaint specifies the infringing activities of the third parties. During VISTA, including 2018 through 2022, IQE and IntelliEpi grew the semiconductors wafers required in any VISTA research and sent those wafers to the other VISTA members. *Id.* ¶¶95, 100, 105; Dkt. 15-15 at 38 (indicating during at least 2018 to 2022 IQE and IntelliEpi supplied wafers and delivered to members for array fabrication). Before shipment, both companies infringed when they tested and characterized those wafers because that testing process requires creating a photodetector when the wafer is probed in order to measure qualities such as dark current, quantum efficiency, and photoluminescence. Dkt. 15 ¶95. JPL infringes by testing the wafers in much the same way. *Id.* ¶¶86(d), 105; Dkt. 15-15 at 39, 45 (noting that JPL "always" does quantum efficiency measurements). Indeed, JPL has collected 10 years of VISTA material measurements through at least 2022. *Id.* Thus, wafers created for VISTA research practiced the asserted patents when IQE, IntelliEpi, and JPL tested them for quantum efficiency, dark current, photoluminescence and other measurements. With regard to the fabricated FPAs for VISTA, the Amended Complaint explains

[4] Although Dr. Maimon reserves the right to amend his claims if discovery shows additional entities infringed under the VISTA program, his Amended Complaint only asserts that JPL, IQE, IntelliEpi, Raytheon, L3Harris, and Teledyne-FLIR practiced the patents for purposes of VISTA research and development after 2018.

that once IQE and IntelliEpi produced wafers for the VISTA program, they were shipped to the other members of VISTA (*e.g.,* Raytheon, L3Harris, Teledyne-FLIR, and JPL) for fabrication into FPAs that were then tested. Dkt. 15 ¶¶89, 96. This process not only creates the photodetector of Dr. Maimon's claims, it also requires etching the wafers into arrays of detector pixels that are also covered by claims of Dr. Maimon's patents. *Id.* ¶¶89 (citing Dkt. 15-15 at 24), 106.

#### 2. How the VISTA Designs Specifically Infringed Dr. Maimon's Patents

After describing the type of infringing activity the third-party VISTA companies performed, Dr. Maimon explains how the specific detector and FPA designs caused infringement. In JPL presentations of 2022 and 2023, scientists Drs. Gunapala, Ting, and Hill, explained that VISTA research focused on improving VISTA detectors generally, and specifically noted that VISTA tested nBn dual band detectors and cBIRD detectors in the later years of VISTA. Dr. Maimon set forth the basis for how these designs used by the VISTA program from at least 2018 through 2022 infringed the '871 and '657 patent. Dkt. 15 ¶¶100-107.

Further still, Dr. Maimon alleged that the VISTA program was tasked with research and development that improved the manufacturability and industrialization of detectors used by Raytheon, L3Harris, Teledyne-FLIR, and JPL in actual products procured by the Government since 2018. *Id.* ¶¶109-121, 188, 207-210, 221-226, 230-234, 240, 251. Thus, Dr. Maimon also accused the creation of infringing detector designs under VISTA for research of actual products procured by the Government.

## III. LEGAL STANDARD

### A. Rule 12(b)(1)

To determine whether subject-matter jurisdiction exists under Rule 12(b)(1), this Court "must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all

reasonable inferences in favor of the plaintiff." *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011). Where a movant "simply challenges the court's subject matter jurisdiction based on the sufficiency of the pleading's allegations … then those allegations are taken as true and construed in a light most favorable to the complainant." *Cedars-Sinai Med. Ctr. v. Watkins,* 11 F.3d 1573, 1583 (Fed. Cir. 1993).

**B. Rule 12(b)(6)**

In order to survive a Rule 12(b)(6) motion, the pleadings need not set forth all evidence but must "give the defendant fair notice of what the … claim is and the ground upon which it rests." *Disc Disease Sols. Inc. v. VGH. Sols., Inc.*, 888 F.3d 1256, 1260 (Fed. Cir. 2018) (quotation omitted). All that is required is that the complaint "state a claim to relief that is plausible on its face." *K-Tech Telecomms, Inc. v. Time Warner Cable, Inc.*, 714 F.3d 1277, 1282 (Fed. Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ). "The plausibility standard set forth in *Twombly* is met when 'the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *K-Tech*, 714 F.3d at 1282-83(citation omitted). While a complaint cannot stand upon conclusory statements alone, "[p]leading on 'information and belief' is permitted … when essential information lies uniquely within another party's control, but only if the pleading sets forth the specific facts upon which the belief is reasonably based." *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1330 (Fed. Cir. 2009); *see also Vanquish Worldwide, LLC v. United States*, 147 Fed. Cl. 390, 401 (2020) (citing *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)).

Determining plausibility of a claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *K-Tech*, 714 F.3d at 1283 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). Indeed, "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint."

*Twombly*, 550 U.S. at 563. A Court's review of the complaint under a motion to dismiss "is generally limited to the face of the complaint, materials incorporated into the complaint by reference, and matters of judicial notice." *K-Tech*, 714 F.3d at 1282.

A patent owner need not identify a defendant's product by name, "especially when the operation of those systems is not ascertainable without discovery." *Id.* at 1286. To the contrary, a plaintiff need only plead infringement with enough facts "'to raise a reasonable expectation that discovery will reveal evidence to support' the plaintiff's allegations." *Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337, 1350 (Fed. Cir. 2018)(quoting *Twombly*, 550 U.S. at 556). That there is any infringement opens the door to reasonable discovery of infringement by other products. *See, e.g., Cormack v. United States*, 117 Fed. Cl. 392, 405 (2014) (granting discovery of non-accused products noting courts "have not required plaintiffs to name specifically the products respecting which they seek discovery to establish their relevance").

**C. Statute of Limitations**

Patent infringement claims under §1498 must be brought within six-years of their accrual, which is the first usage or manufacture of an infringing device after the issuance of the asserted patent. *See JG Techs., LLC v. United States*, 156 Fed. Cl. 691, 700 (2021). While subsequent or repeated uses of a device after its first manufacture or use "does not restart the limitations period," *id.*, subsequent manufacture and uses of other similar devices for the first time within the limitations period are not foreclosed from infringement, *see Starobin v. United States,* 662 F.2d 747, 749-50 (Ct. Cl. 1981) ("The class is not foreclosed from infringing merely because one of its members was manufactured or used by the government more than six years prior to the filing of the suit.").

## IV. ARGUMENT

The Government's Partial Motion to Dismiss does not seek to dismiss the allegations of infringement with regard to the manufacture of infrared detector products for the Government by various defense contractors, JPL, and government agencies. Instead, the Government makes a facial attack on the sufficiency of the Amended Complaint's allegations with regard to the authorization and infringement of research and development detectors made for the VISTA program and whether such activity occurred after November 7, 2018, when the relevant statute of limitations is applied.

The Government makes two attacks. First, the Government contends that the Amended Complaint fails to allege any infringement by JPL or SNL that occurred after November 7, 2018 (the statute of limitation cutoff) or after issuance of the '657 patent on October 4, 2022. Second, the Government contends that, for the VISTA activities of other third parties, there is no evidence that the VISTA work after November 7, 2018 was for the benefit of the Government and with its authorization and consent. Dr. Maimon's disputes the Government's claims.

### A. Dr. Maimon Did Not Assert SNL's Work As A Claim Against the Government

The first and most apparent problem with the Government's attack is that nowhere in the Amended Complaint does Dr. Maimon accuse the Government of being liable for SNL's activities. Dkt. 15 p. v.-vi. & ¶¶313-314, 329-330. The Government appears to misread the allegations by focusing on Dr. Maimon's explanation of the Government's actions in copying his invention through JPL and SNL from 2008 to 2011, leading up to the creation of VISTA. While those facts support the basis for Dr. Maimon's reasoning that the 10-year VISTA program focused its efforts on his invention and its benefits, Dr. Maimon makes no allegation that SNL continued its work on into later years of VISTA. Indeed, the sections of the Amended Complaint that the Government

relies upon as Dr. Maimon's allegations of SNL infringement under VISTA are not contained in the Section of the Amended Complaint relating to VISTA. Dkt. 21 at 12 (citing ¶72 of the Amended Complaint). Accordingly, there is nothing for this Court to dismiss with regard to SNL.

### B. JPL's VISTA Activities Infringed Dr. Maimon's '871 and '657 Patents After November 7, 2018

The Government's misunderstanding continues with regard to JPL's VISTA Activities.

#### 1. The Government's Motion Criticizes JPL's pre-VISTA Activity, Not its VISTA Activity

Like its claims against SNL, the Government bases its arguments on allegations relating to JPL's pre-VISTA activity and ignores JPL's actual VISTA activity. The Government attacks five claims in the Amended Complaint as insufficient to establish infringement within six years of the complaint. They are: (1) that JPL began manufacturing infringing wafers by at least 2008, (2) that JPL worked to improve the detectors from 2008 to 2011, (3) that JPL was able to grow an nBn sample by July 2010, (4) that JPL manufactured nBn FPA prototypes by 2011, and (5) that beginning in 2018, JPL no longer needed to provide wafers to VISTA members. Dkt. 21 at 12. The Government concludes from these claims that "[t]he Amended Complaint does not allege any cognizable act of infringement by JPL after November 7, 2018." *Id*.

But, the Government's argument relies on the same section it did with SNL and criticizes allegations in the Amended Complaint that ***were not describing VISTA***. The first four statements identified by the Government are not part of the Amended Complaint's description of the VISTA program, and the Government fails to address any of the facts actually alleged in the Amended Complaint's description of the VISTA program. Indeed, the paragraphs of allegations the Government attacks are not even part of the Amended Complaint charts summarizing the allegations of infringement. Dkt. 15 p. v-vi. Instead, the section the Government cites refers to the Government's early requests that JPL learn from Dr. Maimon and copy his nBn detector so

they could study and improve upon that work. JPL's initial work lasted from 2007 to approximately 2011, with JPL and the Government concluding that the most promising use of Dr. Maimon's nBn detector architecture was with superlattice materials. *Id.* ¶¶74-75. Thus, the factual allegations in the section that provide dates of this JPL activity, do so strictly for the purpose of telling Dr. Maimon's story of the development of nBn and dating JPLs work ***before*** VISTA started.

Once VISTA started in 2011, the Government, through the Army's NVESD group selected JPL as the trusted entity to manage the VISTA program and employees such as Dr. Gunapala as the task manager for VISTA. *Id.* ¶¶85-86, 284, 289. As detailed in the Amended Complaint, JPL had significant involvement in VISTA through at least 2022, not only through managing its work but also infringing by performing its own testing and research on wafers and FPAs during that time. *Id.* ¶¶85-86, 96, 100-105. JPL employees have even detailed that work and the history of that work in recent years. Dkt. 15-15 at 28, 36, 38-40; DA0086-99.

The fifth claim by the Government appears to come from its interpretation of a statement in the Hill Presentation (cited by and attached to the Amended Complaint) that indicates at some point JPL stopped supplying other VISTA members with semiconductor wafers. Dkt. 21 at 12. But, this comment is not a statement that JPL stopped manufacturing its own nBn wafers or creating photodetectors and FPAs from wafers it was receiving as a member of VISTA for purposes of testing, characterization, and study. To be sure, in a 2022 presentation by JPL VISTA scientists, Dr. Hill, and co-authors Drs. Ting and Gunapala, indicated that IQE and IntelliEpi supplied wafers for testing and array fabrication to "all of the members" of VISTA from 2018 to 2022, which would include JPL. Dkt. 15-15 at 38; *see also* Dkt. 15 ¶¶96, 105 (alleging manufacture and testing of designs by VISTA members including JPL). VISTA members

frequently credited VISTA research efforts for development of their own FPA products that went into products for the Government well past 2018. Dkt. 15 ¶¶111-112, 118-122, 240-241.

#### 2. Dr. Maimon's Actual Allegations Regarding the VISTA Program and JPL's Involvement Allege Plausible Infringement Facts After November 7, 2018

The Amended Complaint lays out the details of VISTA immediately following the paragraphs criticized by the Government and establishes plausible facts regarding JPL's involvement and infringement after November 7, 2018. Dkt. 15 ¶¶76-108 (Sections on VISTA Program). The VISTA program lasted for at least 10 years, including the period from 2018 to 2022, and "[t]hroughout the 10-year VISTA program, … the Government, JPL, and other members of VISTA regularly manufactured and used nBn detectors in order to develop and transition T2SLS nBn detectors into industrial products." *Id.* ¶¶82, 96, 100. In fact, JPL VISTA scientist, Dr. Ting, indicated in a 2019 paper that the "unipolar barrier architecture such as nBn is ***crucial*** for the InAs/InAsSb T2SLS." *Id.* ¶101; Dkt. 15-10 at 7.

But these statements in the Amended Complaint are not just bare conclusions. As Dr. Maimon points out, JPLs work during VISTA included, among other things, fabricating infrared sensors utilizing Dr. Maimon's nBn invention, processing those semiconductor wafers into detector arrays, and testing the materials and detectors arrays with regard to dark current, sensitivity, noise, and other measurements. Dkt. 15 ¶86, 90, 96, 105; Dkt. 15-15 at 39, 45. Specifically, the Amended Complaint alleges that during the second five-year term of VISTA, wafers grown by IQE and IntelliEpi were distributed to the other VISTA members to create FPAs for testing and evaluation. Dkt. 15 ¶96. In particular, the VISTA program, which included JPL, focused on nBn dual band detectors and cBIRD detectors in the later years of VISTA explicitly covering the time period after 2018. *Id.* ¶96, 102.

Dr. Maimon's basis for asserting JPL's use of his inventions from the 2018 to 2022 time period comes directly from JPL's own presentations describing its VISTA work during that time period. For example, in 2022 Drs. Ting and Hill, JPL employees performing research for VISTA, gave back-to-back presentations on the work JPL and others were doing under VISTA. *See* Dkt 15 ¶102 n. 42 (citing Dkt.15-15 Hill Presentation; DA0077-108 Ting 2022 Presentation). In fact, Dr. Hill provided a detailed description of VISTA's accomplishments on a yearly basis, explaining that the later years of VISTA, "we were looking at alternate approaches to high QE [quantum efficiency] in the long wave. Sometimes revisiting the [CBIRDS]. We're looking at manufacturability for the mid wave." Dkt 15-15 at 28. He even specifically noted JPL's interest in nBn dual band detectors that started in 2016 and was "ongoing" as of 2022. *Id.* at 36. And, he indicated JPL was "doing longitudinal studies of dual band wafer performance" and "material characterization studies" over the course of "2018 – present" (*i.e.*, 2018 - 2022). *Id.* at 38. His presentation even referenced standard device analysis measurements that JPL would always perform on such dual band devices, such as quantum efficiency, and indicated that JPL had collected "over ten years of material and measurement." *Id.* at 39, 45. In other words, the Hill presentation cited by the Amended Complaint details what type of work JPL was doing in the specific time period from 2018 onward.

In addition to Dr. Hill's 2022 presentation on what VISTA was doing over the 10-year program, Dr. Ting's presentation that immediately preceded Dr. Hill, "gave an overview of the structure of the devices [VISTA is] using" and "showed how the detector designs that [JPL does] are quite useful for industry." Dkt. 15-15 at 1, 4. Indeed, Dr. Ting's presentation directly correlates to the devices and structures Dr. Hill indicated were tested in the later years of VISTA, in particular 2018 and onward. For example, Dr. Ting described the nBn architecture used in dual

band detectors and JPL's cBIRD design that Dr. Hill indicated were studied in the later years of VISTA. DA0086-97; Dkt. 15 ¶102. Furthermore, Ting described the etching characteristics that would be used with nBn to fabricate arrays from wafers received by VISTA members. *Id.* ¶103-104; DA0087-88, DA0094, DA0098-99. Thus, the allegations and evidence presented in the Amended Complaint make a plausible assertion that JPL's activities infringed specific Maimon patents from 2018 through 2022.

**3. The Government Improperly Interprets and Attacks the Evidence on a Motion to Dismiss.**

The Government's attempts to interpret and discredit JPL's own presentations and patents at this stage of proceedings should be rejected. First, the Government criticizes the 2022 Ting presentation because it does not "mention or state any affiliation with the VISTA program." Dkt. 21 at 4-5. But, a 2022 presentation by JPL relating to infrared detector research and listing authors directly involved with and performing VISTA research does not have to explicitly use the magic word "VISTA" to have a plausible inference it relates to VISTA. In fact, one of the co-authors on the presentation is Dr. Gunapala was the Task manager for VISTA. Dkt. 15 ¶85; DA0077. Further still, Dr. Ting's presentation was given at the same conference and immediately preceded Dr. Hill's presentation. Dr. Hill explicitly referenced Dr. Ting's presentation as describing what VISTA was doing. Dkt. 15-15 at 1, 4 (Dr. Hill refers to Dr. Ting as "Dave" in the opening slide).

Second, the Government contends that the Ting presentation "merely discusses the literature, dating from 2016 and earlier, without identifying any actual manufacture of the devices." Dkt. 21 at 5 (citing DA87-DA95). But, the law does not require presentations to "depict 'functional real-world … systems'" at the pleading stage. *See Power Density Sols. LLC v. United States*, 159 Fed. Cl. 208, 220 (2022). Indeed, the Government's arguments are belied by the Ting Presentation itself. Most notably, the presentation itself is dated 2022 and nothing about Dr. Ting's

presentation indicates it is only discussing the academic literature it cites. To the contrary, the section cited by the Government is explicitly entitled "***Device*** Architecture." DA0086 (emphasis added). Dr. Hill even noted that the Ting presentation represented what VISTA was doing and not simply giving a history lesson. Dkt. 15-15 at 1, 4. Further, the Ting presentation cites multiple presentations and patents after 2016 (DA0085, DA0099, DA0108), and the Ting presentation even describes actual testing and "Device Results" for the same devices accused of infringement. *Compare* DA93-94, DA99 (describing CBIRD and nCBIRD architecture and "Device Results" for n-CBIRD) *with* Dkt. 15 ¶¶102, 105 (describing how such designs n-CBIRD devices described by Ting infringe). Dr. Ting's presentation cites to a 2022 paper that describes the fabrication of an MWIR FPA from InAs/InAsSb T2SLS samples (DA0108), for which even Dr. Ting had noted barrier structures, such as nBn, was "crucial." Dkt. 15 ¶101; *see also id.* ¶¶45, 99, 102 (indicating terms like CBIRD, T2SLS, and HOT-BIRD were shorthand names for devices using Dr. Maimon's nBn invention); Dkt. 15-15 at 28 (indicating VISTA studies of MWIR manufacturability in later years).

Third, while some parts of the presentation reference and credit patents and presentations from previous years to describe and explain the technology, that does not mean the use of the technology by JPL is necessarily limited to when the cited paper published or the patent issued. *Cf. Power Density*, 159 Fed. Cl. at 220 (allowing reliance on prior patents and presentations to give notice of what is asserted to infringe at motion to dismiss stage). For example, DA87 credits Dr. Maimon's 2006 paper on nBn, but it would not be reasonable to infer from that citation that JPL only made nBn detectors in 2006. Such a conclusion would ignore that Ting himself explained that nBn architecture was "crucial" to such T2SLS detectors (Dkt. 15 ¶101) or that Hill explained

JPL's and VISTA's study of nBn dual band detectors from at least 2018 to 2022. *Id.* ¶¶96, 102; Dkt. 15-15 at 36, 38.

The same analysis applies to JPL's patents. JPL itself notes that it licensed patents that use an nBn architecture in 2018 for the manufacture of FPAs. Dkt. 15 ¶240 (citing Dkt. 15-21 at 40). As alleged in the Amended Complaint, the etching designs described by Dr. Ting are similar to the etching designs used in CalTech (*i.e.*, JPL) Patents that describe FPAs. Dkt. 15 ¶104. In fact, the same authors of the Ting and Hill presentations, Drs. Ting, Hill, and Gunapala, are also the inventors on the '036 patent noted in the Amended Complaint. *See* Dkt. 15 ¶104; DA0041. Patents may establish the use of an infringing device, especially where there is a plausible link from the patent to the accused infringement and the technology involved is confidential. *Power Density*, 159 Fed. Cl. at 220.

Thus, the Government's claims that Dr. Maimon has not identified a plausible case that JPL's VISTA activities infringed during the later years of VISTA from 2018 to 2022 should be rejected. The Government's argument regarding JPL criticizes pre-VISTA activity and makes unsupported inferences about the evidence that defy common sense. The Government overlooks the actual section in the Amended Complaint describing the VISTA program and its activities occurring after 2018.

#### 4. Dr. Maimon's allegations establish infringement or the '657 patent that issued October 4, 2022

The Government alleges that Dr. Maimon insufficiently pled infringement of the claims of the '657 patent for VISTA activating that occurred after October 4, 2022, when the patent issued. Dr. Maimon agrees that activity before October 4, 2022 cannot infringe the '657 patent, but he alleges that VISTA activities lasted at least through 2022. Dkt. 15 ¶¶94, 96, 100. The Government does not dispute that VISTA lasted through 2022. Indeed, the VISTA presentations relied upon

by Dr. Maimon made clear that in 2022 work on nBn architecture and materials was ongoing. Dkt. 15-15 at 28, 36, 38. Thus, at this stage it is plausible that VISTA's efforts and JPL's involvement in those efforts would have infringed at least during the last quarter of 2022.

### C. The Pleadings Sufficiently Establish the Work of Third-Party Companies Under VISTA Were For the Government

Next, the Government argues that VISTA research and development by third-party companies should be dismissed because there is no authorization or Government benefit after November 7, 2018. The Government also briefly contends in its background that "the Amended Complaint does not specifically identify any accused activity by any third-party company in connection with the VISTA program besides general allegations that they 'create[d] and test[ed] wafers, detectors and FPAs that have an nBn architecture…'" Dkt. 21 at 6 (citing Dkt. 15 ¶282). Dr. Maimon refutes both criticisms.

#### 1. The VISTA Activities of Third-Party Companies Infringed Dr. Maimon's Patent After November 7, 2018

The Government's claim that Dr. Maimon has not sufficiently plead third party activity under VISTA suffers the same problem as its claims against SNL and JPL. The Government fails to address the appropriate sections of the Amended Complaint and the evidence that actually describes VISTA itself. The Government's claim only criticizes paragraph 282 of the Amended Complaint and simply ignores the Amended Complaint's explanation of the VISTA program, the type of work the members were doing, and how that work infringed and ultimately made its way into products.[5] Dkt. 15 ¶¶76-107, 109-112, 118-122, 240-241.

[5] At one point the Government points out that Northrop Grumman joined VISTA in 2017 and IQE and IntelliEpi participated in 2010 as additional evidence the Dr. Maimon's claims lack support after 2018 (Dkt. 21 at 13), however, Dr. Maimon has not asserted infringement by Northrop Grumman's VISTA work and Dr. Maimon clearly alleges IntelliEpi and IQE work during the second five-year term of VISTA, relevant here. Dkt. 15 ¶¶95-96, 105.

The section of the Amended Complaint that actually details VISTA explains that, during the second five-year term of VISTA, wafer foundries such as IQE and IntelliEpi would grow VISTA wafers and create photodetectors from those wafers during testing. *Id.* ¶95. IQE and IntelliEpi would then send those wafers to the other members of VISTA that would fabricate them into FPAs. *Id.* ¶96, 105. In fact, JPL's Dr. Hill explained in 2022 that such work was being done from 2018 to at least 2022 in order to optimize and improve the VISTA detectors, and to research dual-band and cBIRD detectors using nBn. Dkt. 15-15 at 28, 36, 38; Dkt. 15 ¶102, 295. Indeed, Dr. Ting describes the technical details of these VISTA semiconductor wafers in his concurrent presentation with Dr. Hill (DA0086-99) and Dr. Maimon's Amended Complaint explains how those VISTA designs cause infringement of his patents. Dkt. 15 ¶100-107.

The post-2018 VISTA designs described by Dr. Hill and Dr. Ting would necessarily cause the infringement by the third-party VISTA companies when they tested them or fabricated nBn FPAs from them. Dkt. 15 ¶¶95-96, 102-107. Specifically, "the growth foundries (IQE and IntelliEpi) that grew the wafers and probed them, and other industry participants assigned to fabricate FPAs with such wafers (*e.g.,* HRL, L3Harris, Raytheon, Teledyne-FLIR) would necessarily create an nBn detector" that infringed the '871 patent. *Id.* ¶105. The VISTA members that fabricated the FPAs using the etching described by Dr. Ting infringe additional claims 9 and 15 of the '871 patent and after October 4, 2022, claim 1 of the '657 patent. *Id.* ¶¶106-107. The Government makes no attempt to deny or discredit these factual allegations, and the supporting documents cited by the Amended Complaint indicate this work occurred well past 2018.

Furthermore, the Amended Complaint alleges that the VISTA research and development work that infringed was applied to products that certain third-party companies, such as Raytheon, L3Harris, and Teledyne-FLIR, were producing. *Id.* ¶¶ 109-112, 118-122, 240-241. This allegation

is certainly plausible based on the fact VISTA's entire purpose was to perform research and development that would optimize and industrialize nBn detectors the Government could procure and the Government is now procuring such detectors. *Id.* ¶¶13, 77, 87, 96, 100. Indeed, the later years of VISTA focused on improving manufacturability and optimizing the nBn superlattice detectors. *Id.* ¶96, 295; Dkt. 15-15 at 28, 36, 38.

### 2. The Amended Complaint Adequately Pleads Authorization and Consent and Benefit to the Government After November 7, 2018

Regarding the authorization of VISTA's activities, the Government does not dispute that it granted express authorization and consent to third party companies for VISTA work prior to 2017. Its contention appears to be that the VISTA contracts Dr. Maimon was able to identify from public documents all ended by 2016 and are therefore irrelevant to whether express authorization and consent existed in 2018 and afterward. Dkt. 21 at 13-14. But, the Government does not address the primary allegations of the Amended Complaint in this regard—that the VISTA contract were renewed in 2017 and lasted through 2022.

#### a. Express Authorization and Consent by the Government is Adequately Plead and Strengthened by the Government's New Evidence

Express authorization and consent can come when the Government provides a consent clause in its contracts or solicitations, the broadest of which is found at 48 C.F.R. § 52.227-1 (Alternate 1). *See BAE Sys. Info. & Elec. Sys. Integration, Inc. v. Aeroflex, Inc.*, No. 09-769-LPS, 2011 U.S. Dist. LEXIS 90959, at **37-41 (D. Del. Aug. 2, 2011). Here, the Government's contractual evidence only strengthens Dr. Maimon's basis for alleging that the Government granted express authorization and consent for VISTA from 2018 through 2022 because: (1) the VISTA contracts the Government produced with its Motion prove that the Government expressly authorized VISTA participants to infringe under 48 C.F.R. § 52.227-1 (Alt. 1), and (2) Dr. Maimon

makes uncontested allegations and presents evidence in his Amended Complaint that indicates such contracts were renewed in 2017 for five years through at least 2022. *See Trusted Integration,* 659 F.3d at 1163 ("[A] court must accept as true all undisputed facts asserted in the plaintiff's complaint…").

First, the VISTA contracts related to IntelliEpi, Raytheon, L3Harris, and Teledyne-FLIR identified in the Amended Complaint and produced by the Government have an express authorization and consent clause. DA0129, DA0152, DA0261, DA0279, DA0311, DA0482, DA0544. The Government's claim that these contracts are irrelevant because they all expired by 2016 is contrary to undisputed allegations. The Amended Complaint specifically alleges and relies on evidence that, when the VISTA consortium was supposed to end in 2016, the Government renewed VISTA. Dkt. 15 ¶94 (citing Dkt. 15-15 at 37). In fact, the Hill Presentation, attached to and relied on by the Amended Complaint for this pleading, specifies "[t]he original Industrial Consortium ***contract*** was for five years and ***was renewed in 2017***." Dkt. 15-15 at 37 (emphasis added). The Government's motion makes no attempt to overcome these alleged facts or evidence. Thus, regardless of whether the original contracts cited by the Government ended in 2016, the alleged facts are that they were renewed in 2017 for a second five-year term lasting through 2022.

Second, even if the specific contracts cited by Dr. Maimon did expire in 2016, that does not alter the underlying allegations that there were renewal contracts in 2017. Dr. Maimon is not required to identify specific contracts in order to establish reasonable inference that the Government expressly authorized and consented to infringement. *See JG Techs.*, 156 Fed. Cl. at 713 (rejecting need to present "relevant contracts" in the pleadings). Though contracts themselves are not public, Dr. Maimon identified what numbers he could from public sources describing VISTA work. Dkt. 15 ¶¶84, 92, 95 n.35. Dr. Maimon did not suggest or claim that the specific

contracts identified were the ***only*** VISTA contracts. Tellingly, the Government itself makes no claim it has produced all VISTA contracts, and it certainly has not produced the renewal contracts identified by Dr. Hill, nor has it denied their existence. The Government cannot produce some confidential VISTA contracts to criticize some of Dr. Maimon's allegations, but hide behind the confidential nature of other VISTA contracts it refuses to disclose. *K-Tech*, 714 F.3d at 1286 ("A defendant cannot shield itself from a complaint for direct infringement by operating in such secrecy that the filing of a complaint itself is impossible."). Even if the specific contracts the Government produced in its motion ended in 2016, that does not change the fact that the contracts were renewed in 2017, and it is a reasonable inference those renewed contracts provide the same express authorization and consent as the VISTA contracts the Government did produce.

Even without the actual contracts, the pleadings and evidence they rely upon indicates that the Government intended to enter contracts with VISTA participants, based on the NASA Prime Contract NAS7-03001 that included authorization and consent. Dkt. 15 ¶¶83, 297-299. The Government criticizes Dr. Maimon's citation to the VISTA Task Plan circulated to potential VISTA members in 2010 as too old and only referencing contracts between NASA and JPL, not the third-party companies. Dkt. 21 at 15. Yet, the Task Plan clearly indicates that the contract between the companies and NASA would be in accordance with the NASA Prime Contract. Dkt. 15 ¶83 (citing Dkt. 15-13 at 8 and Dkt. 15-15 at 6). The evidence at hand in the form of the VISTA Task Plan and the NASA Prime Contract provides more than a reasonable inference the VISTA contracts signed were indeed in accordance with the NASA Prime Contract.

To be sure, the existence of such contracts between the Government and industry was confirmed when Dr. Hill, speaking for JPL, reported in 2022 that "now there's a prime contract between NASA, which is JPL's parent, and our industry participants." Dkt. 15 ¶297 (citing Dkt.

15-15 at 6); *see also Saint-Gobain Ceramics & Plastics, Inc. v. II-VI Inc.*, 369 F. Supp. 3d 963, 980 (C.D. Cal. 2019) (noting authorization for pre-contract activities when prime contract ultimately awarded (citing *BAE Sys.*, 2011 U.S. Dist. LEXIS 90959, at *37-41 (D. Del. Aug. 2, 2011)). Further still, Dr. Hill's presentations specifically confirm the association of IP and patent rights to those contracts, noting that the contracts between NASA and industry participants "establishes an easy access to the IP, low rate for the patents." Dkt. 15-15 at 6. The contracts produced by the Government for the first half of VISTA only confirm Dr. Maimon's reasonable interpretation of the VISTA Task Plan and the statements by Dr. Hill—*i.e.,* that the Government did in fact enter into contracts with VISTA members in accordance with NASA-JPL contracts that included the 52.227-1 clause.

The Government's reference to the age of the VISTA Task Plan is not enough to deny jurisdiction, especially in light of the additional pleadings the Government does not dispute. Dkt. 21 at 15. The Amended Complaint and the evidence attached with it clearly indicate the VISTA program started in and around 2011 and lasted through at least 2022 after the VISTA contracts were renewed in 2017. Dkt. 15 ¶¶82, 94, 283; Dkt. 15-15 at 3. Simply because the third parties may have signed agreements before November 7, 2018 does not mean they are *per se* inapplicable after November 7, 2018, or that a new contract must be entered after November 7, 2018 to reestablish authorization.

Third, the Government's VISTA contract evidence is incomplete. Either the contract attachments to the Government's motion are incomplete because they do not show the renewal in 2017, or the Government's production of VISTA contracts is incomplete because the renewed contracts from 2017 are not included in the Government's motion. Further still, the face of the contracts indicate there is more that the Government has not produced. For example, several

contracts identify work statements and other attachment, yet none have been provided. *See, e.g.,* DA0121, DA0237, DA0272, DA0321. Indeed, the Government even attaches documents related to the contracts justification and purpose that are still redacted. DA0664-670. The Government cannot assert a lack of authorization and consent based on its incomplete production of documents and its lack of any assertion those documents represent all the VISTA contracts, including renewal contracts. To the contrary, this behavior implicitly acknowledges the sufficiency of the allegations and the need for further discovery.

Fourth, even if there is not sufficient evidence of a contract clause, the Government's actions during VISTA indicate express consent. Express consent can also be found even without express contract clauses if the Government requires the infringement to fulfill a company's legal obligations or contract, *see Sevenson Envtl. Servs. v. Shaw Envtl., Inc.,* 477 F.3d 1361, 1366-67 (Fed. Cir. 2007); *IRIS Corp. v. Japan Airlines Corp.*, 769 F.3d 1359, 1362 (Fed. Cir. 2014), or the Government participates in the research and indicates it will implement a technology from a third party pilot project if successful, *see Advanced Software Design Corp. v. FRB of St. Louis*, 583 F.3d 1371, 1376-77 (Fed. Cir. 2009). Here, Dr. Maimon alleges that the Government participated in and directed the research and development conducted under VISTA. Dkt. 15 ¶81, 288-289. Furthermore, the Government was clear that it created the VISTA program to improve and industrialize III-V superlattice infrared detectors that used Dr. Maimon's nBn patented designs and, if successful, intended to and in fact did adopt such detectors for the U.S. Military. *Id.* ¶¶77, 87-88, 97-98, 100. Thus, there is sufficient allegations and evidence indicating express authorization.

**b. Implied authorization and consent is adequately plead**

Even if the Government is correct that the renewed VISTA contracts do not have the same express authorization and consent for VISTA research, the authorization and consent can still be

implied. The Federal Circuit is clear that "coverage of § 1498 should be broad so as not to limit the Government's freedom in procurement by considerations of private patent infringement." *Advanced Software*, 583 F.3d at 1375 (citation omitted). To that end, the Federal Circuit holds that implied consent protects pre-contractual activities of third parties. *See TVI Energy Corp. v. Blane*, 806 F.2d 1057, 1060 (Fed. Cir. 1986) (finding consent even though the "the Government specifications for the targets did not absolutely require Blane to infringe TVI's patent").

This broad view of Government consent is necessary because Congress intended under § 1498 "to allow the Government to procure whatever it wished regardless of possible patent infringement." *Id.* To be sure, "[s]ection 1498(a) would be emasculated if a patent holder could enjoin bidding to supply infringing products." *Trojan, Inc. v. Shat-R-Shield, Inc.*, 885 F.2d 854, 856 (Fed. Cir. 1989); *see also Astaris, LLC v. Fire-Trol Holdings, LLC*, No. 03-cv-1468-PHX-ROS, 2006 U.S. Dist. LEXIS 384, at **20 (D. Ariz. Jan. 5, 2006) (noting that a purchase order with necessary consent was not required before starting design and development work).

The Federal Circuit and the district courts have consistently applied this view of consent for a variety of activities that did not fall under an explicit Government contract. For example, the Federal Circuit held there was consent when the Government actively participated with third parties in testing the infringing product. *Advanced Software,* 583 F.3d at 1376; *see also Hughes Aircraft Co. v. United States*, 534 F.2d 889, 902 (1976) (applying §1498 where "the U.S. Government … assumed full and exclusive control of the project"). Similarly, the district courts have held that a potential "contractor … is properly protected under § 1498 from liability for patent infringement ***even during the time it develops and manufactures a small quantity of infringing product for testing*** when the product is later subject to bidding to supply the United States with the product." *Astaris*, 2006 U.S. Dist. LEXIS 384, at **21-22 (emphasis added). Thus, implied

consent applies to the development, prototyping, testing, and demonstration of products requested by the Government. *See BAE Sys.*, 2011 U.S. Dist. LEXIS 90959, at *42-43; *see also Raymond Eng'g Inc. v. Miltope Corp.*, No. 85 CIV. 2685 (RWS), 1986 U.S. Dist. LEXIS 25135, 1986 WL 488 (S.D.N.Y. May 23, 1986) (applying § 1498 to the manufacturing of prototypes).

The Government argues that implied consent requires evidence of a "specific instruction from the Government, such as 'contracting officer instructions' or 'specifications or drawings which impliedly sanction and necessitate infringement.'" Dkt. 21 at 16. But, courts have found implied consent without instructions or specifications that necessitate infringement. *See TVI Energy*, 806 F.2d at 1060 (finding consent even though government target specifications "did not absolutely require [third party] to infringe [plaintiff]'s patent" at a required demonstration). Indeed, courts have even held that an explicit request by the Government for the research and supply of infringing goods is not required. *See Saint-Gobain*, 369 F. Supp. 3d at 978-80. In *Saint-Gobain*, the court considered an application of § 1498 when the Government had not issued a formal solicitation or bidding process. *Id.* at 979-80. The court held that §1498 applied because the supplier knew of the Government's interest in acquiring sapphire sheets when it started the development efforts, and therefore the later consent of the Government through a Lockheed prime contract to supply the F-35, "impliedly authorized and consented to the pre-contractual development activities." *Id.* at 968, 980.

VISTA was a critical program to the Government in order to maintain its edge in the IR detection field and third-party companies were organized under the program to industrialize the nBn superlattice technology so it could be used in military products. *Id.* ¶¶77, 87-88, 100. As alleged in the Amended Complaint, that is exactly what happened over the ten-year VISTA program. Not only did the Government instruct VISTA participants to research nBn detectors as

part of VISTA, it had VISTA members provide specific types of semiconductor wafers that would cause infringement when they were probed, tested, or fabricated into FPAs. *Id.* ¶¶78-80, 95-98, 101-107.

The Government did not give VISTA members free reign to do whatever they wanted. Instead, the Government organized and controlled the VISTA program and specifically requested that suppliers research, develop, prototype and test nBn detector technology based on Dr. Maimon's inventions for future supply contracts with the Government. *Id.* ¶¶77-80, 85-86, 95-96, 284-285, 289. It is evident not only that those participants performed that work, but they continued that work through 2022 when the renewed five-year term of VISTA came to an end. *Id.* ¶¶94-96, 102-107. Indeed, from 2018 to 2022, the Government explicitly focused the VISTA efforts on the manufacture of nBn superlattice structures found in the products being developed by the third parties and also research into nBn dual band and cBIRD detectors that infringed. *Id.* ¶¶96, 102-107; Dkt. 15-15 at 28.

If the Government's position on § 1498 is accepted here, it "would defeat the Congressional intent [of § 1498] to allow the Government to procure whatever it wished." *TVI Energy,* 806 F.2d at 1060. In such a scenario, Dr. Maimon could have subjected the Government's entire VISTA program to a threat of injunction and prevented the Government from obtaining the advanced nBn IR detection systems it sought to research in VISTA. This conclusion runs contrary to Government's own testimony that VISTA "helps keep the United States competitive in fielding advanced surveillance systems." *The Impacts of Sequestration and/or a Full-Year Continuing Resolution on the Department of Defense: Hearing Before the Comm. on Armed Services,* 113th Cong. 173, S. Hrg. 113-173 (2013) (cited at Dkt. 15 ¶288 n.191 and provided in record at Dkt. 9-10 at 56). And, as one court has already noted in deciding authorization and consent for research

into similar programs, "the F-35 fighter project is critical to national security and may not be placed in jeopardy for any reason whatsoever." *See Saint-Gobain*, 369 F. Supp. 3d at 976.

The Government cites *Pieczenik v. United States*, No. 2023-1376, 2023 LEXIS 20418 (Fed. Cir. Aug. 8, 2023) for support that the pleadings are conclusory. Dkt. 21 at 12-14. In *Pieczenik*, however, the Plaintiff generally alleged that an agreement and documents "granted 'authorization and consent' to various laboratories for all use and manufacture of the technologies recited in the '363 patent…' and "'the '363 invention is used in research and clinical treatments' and that the government has entered into agreements with entities that 'have a history of using the technology and products described in the '363 patent." *Id.* at *6. The court held that such conclusory allegations were insufficient because there was no description of the agreements or grants alleged and "no factual allegations linking the accused use *to* the alleged agreements." *Id.* at **6-7.

To the contrary, Dr. Maimon pleads facts and presents evidence that the Government established VISTA after learning of his inventions and with the explicit purposes of having the third parties conduct research and development of Dr. Maimon's inventions. Dkt 15 ¶¶68-69, 75, 77-80. As described previously, there is express evidence the Government contracts offered authorization and consent to the VISTA participants and the Government even participated and controlled VISTA. *See supra* Section IV.C.2.a. Unlike *Pieczenik,* Dr. Maimon links his patented technology to that researched and developed during VISTA with the Government knowledge and direction as well as products procured as a result of VISTA. Dkt. 15 ¶¶68-69, 72-87, 90-99, 100-107, 109-115,117-123, 283, 286. All of this leads to the inevitable and reasonable conclusion that the Government consented to and even required infringement.

The Government's argument seems to suggest that support for authorization and consent must come from some evidence that actually post-dates November 7, 2018, but there is no support

for this argument. Dr. Maimon's burden is to allege facts and make conclusions based on reasonable inferences that authorization and consent existed after November 7, 2018. In this case, the VISTA program started in 2011 under an original five-year contract that was renewed in 2017 with work continuing well into 2022. Dkt. 15 ¶82, 94-96, 102, 283. This included at least work by IQE and IntelliEpi to supply and test wafers and work by L3Harris, Raytheon, and Teledyne-FLIR to fabricate FPAs from those wafers. *Id.* ¶¶95-96, 105. There is no indication in the pleadings that the Government somehow hit a reset button on November 7, 2018 that nullified the purposes of VISTA or the intentions of VISTA to industrialize the nBn product. If anything, the Amended Complaint and evidence attached with it are clear that the work into nBn was "ongoing" in 2022. *Id.* ¶96; Dkt. 15-15 at 28, 36, 38.

**c. Government benefit is adequately plead**

Next, the Government challenges whether the VISTA program benefited the Government. While the benefit to the Government from third party activity cannot be merely incidental, there is no requirement that the Government be "the sole beneficiary" or even the primary beneficiary of the infringing activity. *Advanced Software*, 583 F.3d at 1378-79 . Courts have found that a third party's activities benefit the Government for a multitude of different reasons, but protection of research and development of products for the U.S. Military is a core purpose of § 1498. *See BAE,* 2011 U.S. Dist. LEXIS 90959, at **31-32 (noting R&D for military operations in the First World War was the "most basic purpose of § 1498"); *see also TVI Energy,* 806 F.2d at 1059-60 (noting statute amended at request of the Navy).

Courts also have found other activities benefit the Government, such as "averting fraud in Treasury checks" that save government resources, *Advanced Software*, 583 F.3d at 1378; providing hazardous waste remediation services sought and received by the Government, *Sevenson Envtl. Servs. v. Shaw Envtl., Inc.,* 477 F.3d 1361, 1366-67 (Fed. Cir. 2007); increasing competition in the

defense industry to make advanced "technology…at a lower price," *BAE Sys.*, 2011 U.S. Dist. LEXIS 90959, at *34; or providing "testing and evaluation … [that gives] the government … a fuller understanding of … current technologies," *id.* at *34.

The activities of the third parties alleged in the Complaint benefit the vital national interests of the United States Government in defense and security by providing lighter, smaller, more efficient, cheaper, and more robust infrared detectors and cameras for the military. Dkt. 15 ¶¶69-71, 77, 110, 291-294. VISTA's benefits were not simply incidental to the Government. Indeed, the research, development, testing, prototyping, and industrialization of nBn superlattice detectors that used Dr. Maimon's inventions were specifically sought by and received by the Army's NVESD group when it organized and led the VISTA program after determining the United States was losing its dominance in infrared detectors. *Id.* ¶¶ 67, 69-71, 77, 87, 291-294. Because nBn detectors had significant benefits over conventional designs, the entire purpose of the VISTA work was to better understand, test, evaluate, and improve nBn detectors so they could be procured by the Government in functioning systems. *Id.* ¶¶76-77, 87, 291-294.

From the very beginning of VISTA, it was clear that participants would develop Dr. Maimon's nBn detectors into industrial products that could be procured by the Government. In 2010, the NVESD group explained how VISTA sought research into specific "nBn structures for advanced infrared FPAs." Dkt. 15 ¶78. The intended benefits of that work on nBn barrier detectors can further be seen in the VISTA Task Plan circulated by the Government that indicates the work would benefit "NASA planetary science instrument[s]," "make advanced infrared detectors available for deployment by agencies of the United States," "mov[e] the technology quickly toward industrial fabrication and field deployment." Dkt. 15-13 at 3-4, 6. VISTA further benefited the Government by accelerating industrialization of such products and reducing

procurement costs by creating a more competitive industry. Dkt. 15 ¶¶77, 294; *BAE Sys.*, 2011 U.S. Dist. LEXIS 90959, at *34.

Recognition of the Government's VISTA benefits have extended to the highest levels of Government, including recognition in Senate testimony that "the Army's Vital Infrared Sensor Technology Integration (VISTA) program… ***helps keep the United States competitive in fielding advanced surveillance systems***." Dkt. 9-10 at 5 (emphasis added).

While the Government does not dispute the allegation of benefits from VISTA pre-November 7, 2018, it argues that there must be some separate identification of benefits evolving from post-November 7, 2018 activity. Dkt. 21 at 16. But again, there are sufficient plausible allegations that the work of VISTA by third parties after November 7, 2018, like that done before it, was for the benefit of the Government. As explained by Dr. Maimon, the VISTA program was a 10-year program that extended from at least 2011 to 2022. Dkt. 15 ¶¶82, 94, 283. The benefits of VISTA to the Government on November 6, 2018 were the same as the benefits on November 8, 2018 and the Government provides no basis to infer otherwise. While VISTA accomplished different things at different times, the facial allegations are that the benefits of VISTA research and development covered the entire arc of its existence. There is no indication in the Amended Complaint or the Government's arguments that the Government benefits of the 10-year VISTA program somehow abruptly ended on November 7, 2018.

Indeed, the Government benefits from VISTA and recognition that its research work was not complete is the reason the Government renewed the VISTA contracts in 2017 and continued the VISTA work through 2022. Dkt. 15-15 at 37. In particular, the Army's NVESD group realized the consortium was keeping the VISTA participants together and that "there are still a lot of aspects to address fundamentally [such as] [p]assivation, longwavelength QE, [and] newer device

designs." *Id.* Thus, more than a plausible basis exists for the assertion that the benefits to the Government from VISTA extended throughout its 10-year term.

### D. If Necessary, Dr. Maimon Should Be Granted Leave to Amend and Add Dates Based on the Evidence Attached to the Amended Complaint

Despite the confidential nature of VISTA, Dr. Maimon has attempted to be as specific as possible and attach or cite evidentiary support for his pleadings whenever possible. Dr. Maimon asserts that the Amended Complaint pleadings, the evidence cited and attached to that Amended Complaint, the evidence attached to the Government's Motion, and the reasonable inferences that should be applied to such pleadings and evidence lead to the reasonable conclusion that the infringing activities by JPL, IQE, IntelliEpi, Raytheon, L3Harris, and Teledyne-FLIR and the Government's authorization of them existed in the relevant time period after November 7, 2018. However, to the extent this Court finds that the pleadings do not adequately identify specific dates or inferences discussed in this Response or the supporting evidence, Dr. Maimon requests leave to specifically plead such dates as necessary to perfect any deficiency.

## V. CONCLUSION

For the reasons discussed herein, Dr. Maimon has adequately plead Government liability for VISTA research and development activities under §1498 for the relevant time period after November 7, 2018. Accordingly, the Government's motion should be denied. In the alternative, if the Court deems any pleading deficient or unclear with regard to specific dates Dr. Maimon should be allowed to amend his Complaint to provide more specific dates based on the evidence and inferences discussed herein.

Dated: August 15, 2025

Respectfully submitted:

/s/ *Meredith Martin Addy*

MEREDITH MARTIN ADDY
Attorney of Record

ADDYHART LLC
10 Glenlake Parkway, Suite 130
Atlanta, Georgia 30328
312.320.4200
meredith@addyhart.com

Of counsel:
CHARLES A. PANNELL III

ADDYHART LLC
10 Glenlake Parkway, Suite 130
Atlanta, Georgia 30328
770.715.2020
cpannell@addyhart.com

*Attorneys for Plaintiff*
*Shimon Maimon*